## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

Docket Number(s): **22-1410**  Caption [use short title]

Motion for: **Certificate of Appealability**

**Tarantino v. United States of America**

Set forth below precise, complete statement of relief sought:

Requesting a Certificate of Appealabilty on grounds as set forth in attached motion

MOVING PARTY: **Christian Tarantino**   OPPOSING PARTY: **United States of America**

☐ Plaintiff   ☐ Defendant

☑ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: **Todd G. Scher**   OPPOSING ATTORNEY: **Charles Rose, AUSA**

[name of attorney, with firm, address, phone number and e-mail]

**Law Office of Todd G. Scher, P.L.**   **USAO, E. D. New York**

**1722 Sheridan Street #346, Hollywood FL 33020**   **271-A Cadman Plaza East, Brooklyn NY 11201**

**(754) 263-2349; tscher@msn.com**   **(631) 715-7844; Charles.Rose@usdoj.gov**

Court- Judge/ Agency appealed from: **U.S. Dist. Court, E.D.N.Y. (Seybert)**

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date: _____

Signature of Moving Attorney:

**/s/ Todd G. Scher**   Date: **8/2/22**   Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

**CASE NO. 22-1410**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

CHRISTIAN GEROLD TARANTINO,
Movant-Appellant,

V.

UNITED STATES OF AMERICA,
Respondent-Appellee.

---

On Appeal from the United States District Court
For the Eastern District of New York
Case No. 2:08-cr-00655-JS
Case No. 2:16-cv-03770-JS
Honorable Joanna Seybert, District Judge

---

**APPELLANT'S APPLICATION FOR**
**CERTIFICATE OF APPEALABILITY**

---

Todd G. Scher, Esq.
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, Florida 33020
Tel: 754-263-2349
Fax: 754-263-4147
tscher@msn.com
Counsel for Movant-Appellant

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

CHRISTIAN GEROLD TARANTINO,
    *Movant-Appellant*,

v.                                                  Case No. 22-1410

UNITED STATES OF AMERICA,
    *Respondent-Appellee.*

---

**Appellant's Certificate of Interested
Persons and Corporate Disclosure Statement**

The following persons have an interest in the outcome of this case:

Christian Gerold Tarantino, Movant-Appellant

Todd G. Scher, Esq., Counsel for Movant-Appellant

Eliza D. Stahl, Esq., Former Counsel for Movant-Appellant and Affiant

Stephen Rosen, Esq., Former Retrial Counsel for Movant-Appellant

James Froccaro, Esq., Former First Trial Counsel for Movant-Appellant

Honorable Joanna Seybert, U.S. District Court Judge

Special Agent Robert Schelhorn, F.B.I. Case Agent

AUSA Carrie N. Capwell, Esq., U.S. Attorney's Office (E.D.N.Y.)

AUSA Sean C. Flynn,  Esq., U.S. Attorney's Office (E.D.N.Y.)

AUSA James M. Miskiewicz, Esq., U.S. Attorney's Office (E.D.N.Y.)

AUSA Charles N. Rose, Esq., U.S. Attorney's Office (E.D.N.Y.)

AUSA David C. James, Esq., U.S. Attorney's Office (E.D.N.Y.)

Marcus J. Marshall, Case Manager

No publicly traded company or corporation has an interest in the outcome
of this case.

I certify that I believe the Certificate of Interested Persons is complete.

Respectfully submitted,

/s/ Todd G. Scher
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, Florida 33020
Tel: 754-263-2349
Fax: 754-263-4147
tscher@msn.com
Counsel for Movant-Appellant

## A. <u>IDENTITY OF MOVING PARTY AND RELIEF REQUESTED</u>

Christian G. Tarantino (Tarantino) movant-appellant, asks this Court to grant him a certificate of appealability (COA). *See* 2d Cir. Rule 22.1.

## B. <u>STATEMENT OF FACTS</u>

### 1. <u>Procedural History</u>

On September 23, 2008, Tarantino was indicted as follows: Count 1 alleged that, on or about June 23, 1994, Tarantino willfully endangered the safety of a commercial motor vehicle operator which resulted in the death of Julius Baumgardt, in violation of 18 U.S.C. 18 U.S.C. § 33. Count 2 alleged that, on or about August 12, 1994, Tarantino committed the obstruction of justice murder of Louis Dorval, in violation of 18 U.S.C. § 1512(a)(1)(C). Count 3 alleged Tarantino conspired to commit the obstruction of justice murder of Vincent Gargiulo, in or about and between December 2002 and August 8, 2003, in violation of 18 U.S.C. § 1512(k). Count 4 alleged that, on or about August 18, 2003, Tarantino committed the obstruction-of-justice murder of Gargiulo, in violation of 18 U.S.C. § 1512(a)(1)(C). The first trial began with pre-screening of jurors on March 17, 2011, Judge Joanna Seybert (Judge Seybert), presiding. On May 14, 2011, Tarantino was convicted of Counts 1 and 2, but the jury "hung" on Counts 3 and 4. Retrial commenced on April 10, 2012. On May 14, 2012, Tarantino was acquitted on Count 4, but convicted on Count 3. In April 2013, Tarantino was sentenced to three terms of life imprisonment, and Tarantino timely filed his direct appeal.

On the appeal, this Court affirmed his convictions, rejecting, *inter alia*, arguments that Tarantino's right to be present during pre-screening of jurors for cause was violated in the absence of a waiver of his right to be present, that a tape made by Vincent Gargiulo was improperly admitted into evidence at both trials, and that first trial counsel, James Froccaro (Froccaro), labored under an actual conflict and the court failed to conduct a requested hearing. *See United States v. Tarantino*, 617 Fed. App'x. 62 (2d Cir. 1995).

On June 27, 2016, the U.S. Supreme Court denied Tarantino's petition for a writ of *certiorari*. *See Tarantino v. United States*, 579 U.S. 935 (2016). On the same date, Tarantino filed a *pro se* petition under 28 U.S.C. § 2255. On June 27, 2017, counsel filed a supplemental § 2255 petition for Tarantino raising ineffective assistance of counsel claims. On July 14, 2017, with leave to correct to conform to Judge Seybert's individual rules, counsel refiled the supplemental § 2255 petition.

Complying with an Order by Judge Seybert dated September 19, 2019, an "Amended Supplemental Motion Under 28 U.S.C. § 2255 To Vacate/Set Aside Illegal Convictions/Sentences Filed By A Person In Custody Of The United States" was filed on October 4, 2019 (hereinafter, "ECF No. 510" or "§ 2255 Petition"). Tarantino renewed the claims raised in his 2017 petitions, in pertinent part, that (1) Froccaro excluded Tarantino from the pre-screening of jurors for cause through disobedience of a direct court command, denying him the fundamental constitutional right to be present during a critical phase,

ii

(2) Froccaro operated under an actual undisclosed benefactor conflict that adversely affected his trial performance and simultaneously represented his benefactor Scott Mulligan and Tarantino before and during the first jury trial, (3) Both first trial counsel and retrial counsel failed to seek the exclusion of inadmissible evidence, without which there was insufficient evidence to convict at the first trial requiring Rule 29 acquittals, barring retrial under double jeopardy clause principles, (4) Retrial counsel rendered ineffective assistance in failing to seek Judge Seybert's recusal for demonstrated bias, and Tarantino raised the additional claim that first trial counsel and retrial counsel were ineffective for failing to permit him to testify in support of his motion to suppress tape evidence, misadvising that Tarantino's testimony in support of a pretrial suppression hearing would be used against him at trial. *See* ECF No. 510 at 29-44 (discussion of additional ineffectiveness claim). On November 25, 2019, the government filed a letter response, ECF No. 513, to which Tarantino replied on February 14, 2020. *See* ECF No. 516. Then, on September 14, 2020, Tarantino filed his § 2255 Rule 6 Discovery Motion, *see* ECF No. 518, the government filed a letter response opposing the motion on January 29, 2021. *See* ECF No. 519. On May 5, 2022, Judge Seybert filed her Memorandum and Order denying relief without a hearing as to all issues, and denying a COA. *See* Exhibit A (ECF No. 520, at p.38). Notice of appeal was filed on July 4, 2022. This application for a COA is being timely filed.

## 2. <u>Facts Relevant to Each Issue</u>

This application requesting the issuance of a COA

"must include… a statement that (1) identifies each issue that the applicant intends to raise on appeal and the relevant facts, and (2) makes a substantial showing of a denial of a constitutional right as to each issue."

*See* 2d Cir. Rule 22.1. Each issue that Tarantino intends to raise on appeal and the relevant facts are identified at pp.1-32, *infra*, where applicant makes a substantial showing that he was denied fundamental constitutional rights.

## C. <u>STATEMENT OF THE ISSUES</u>

Tarantino seeks a COA for each of the following six (6) issues:

1. Because Tarantino's first trial counsel disobeyed a direct and explicit order of the trial judge to "visit" Tarantino to review all juror questionnaires, he was in contempt constituting an obstruction of justice as a matter of law. The implied waiver of the constitutional right to be present during the critical phase of pre-screening jurors for cause was invalid because first trial counsel failed to object to Tarantino's absence since it would have required him to reveal his defiance of the court command, in violation of 18 U.S.C. § 401. This is *per se* deficient performance by counsel that caused structural error of constitutional magnitude not subject to harmless error/prejudice analysis. The "mandate rule" cannot be applied to procedurally bar the claim because, on direct appeal, this Court did not have the new evidentiary record available for the first time in the § 2255 Petition proving counsel's contempt of court by disobeying the order that implicated the constitutional right to be present.

iv

2. Because first trial counsel Froccaro operated under actual undisclosed benefactor conflict of interest that adversely affected his performance at trial, Tarantino was denied his constitutional right to the assistance of counsel that would have required effective counsel to shift the blame from Tarantino to Scott Mulligan, who paid Froccaro for Tarantino's trial defense while he was also simultaneously defended by Froccaro before and during the first trial. Tarantino was entitled to a § 2255 testimonial hearing based on the highly detailed affirmation of civil litigation lawyer Eliza D. Stahl that provides the new evidentiary record for the first time revealing the benefactor conflict and the simultaneous representation of Tarantino and benefactor Scott Mulligan.

3. Because first trial counsel failed to object to inadmissible testimony, without which the chain of evidence was insufficient to convict Tarantino as to Counts 3 and 4 and required Rule 29 judgments of acquittal that would have barred retrial under double jeopardy clause principles, first trial counsel rendered ineffective assistance. Even if *post mortem* statements incorrectly introduced under 801(d)(2)(E), Fed.R.Evid., as statements during the course and in furtherance of a completed conspiracy, were nonetheless admissible under Rule 804, Fed.R.Evid., due to the unavailability of alleged hired killer Justin Bressman (Bressman), without the testimony of Tarantino's attorney (in the same case) identifying Tarantino as who contacted him regarding the questioning of Bressman, there was insufficient evidence. Without the client-identifying testimony providing the last direct link in the chain of evidence

v

(*i.e.*, attorney Roth identifying Tarantino as the party who called him about police questioning linked to statement by Bressman that "Matty Roth" who hired him to murder Gargiulo arranged for an attorney to intervene during his police questioning), Tarantino would have been entitled to final Rule 29 judgments of acquittal, barring a retrial under double jeopardy principles. Retrial counsel also failed to object to the same inadmissible trial evidence. Therefore, a hearing should have been held on this ineffectiveness claim.

4. Because Judge Seybert overlooked or was willfully blind to specific conflict of interest and ineffective assistance of counsel claims raised, and did not review those issues, Tarantino was denied constitutional due process.

5. Because first trial counsel and retrial counsel misadvised Tarantino as to his personal constitutional right to testify in his own defense in support of suppressing centerpiece tape evidence, by misinforming Tarantino that his testimony in support of suppression would be used against him during trial, contrary to U.S. Supreme Court caselaw, they rendered ineffective assistance which prejudiced the trial defense. The "mandate rule" cannot be applied to procedurally bar the claim because, on direct appeal, this Court did not have the new evidentiary record available for the first time in the § 2255 Petition proving that first trial counsel and retrial counsel misadvised Tarantino that his testimony for a suppression hearing would be used against him at trial, obstructing his absolute personal constitutional right to testify in his own defense to suppress centerpiece evidence. A hearing should have been held.

6. Because retrial counsel failed to move for the recusal of Judge Seybert for shown bias in allowing a retrial witness to waive grand jury indictment for a capital offense punishable by death and in accepting a void plea to an information negotiated to secure the testimony of the witness, Tarantino was denied his constitutional right to effective assistance of counsel, and Judge Seybert's willfull blindness to the facts and argument shows her bias even tainted her review of the § 2255 Petition. A hearing should have been held.

## D. <u>STANDARD FOR GRANT OF COA</u>

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). This standard is satisfied "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). More recently, the U.S. Supreme Court made clear that "a court of appeals should limit its examination [at the COA stage] to a threshold inquiry into the underlying merit of [the] claims," and ask "only if the district court's decision was debatable." *See Buck v. Davis*, 580 U.S. 100, 116 (2017) (*quoting Miller-El*, 537 U.S. at 327). The court of appeals should not first decide the merits of the appeal and then justify denial of a COA on the basis of such adjudication, inverting the statutory order and placing too heavy a burden on the applicant at the COA stage. *Id*. at 116-117 (*citing Miller-El*).

<u>**ARGUMENT**</u>

***Reasonable Jurists Could Disagree on Whether the "Mandate Rule" Bars the Ineffective Assistance of Counsel Claim Based on Factual Predicate that First Trial Counsel Disobeyed a Direct Order in Contempt of Court Constituting an Obstruction of Justice as a Matter of Law that Deprived Petitioner of his Constitutional Right to be Present to Pre-Screen Jurors and Whether a Hearing Should Have Been Held.***

<u>**Deficient Performance of Counsel and Structural Error**</u>

On March 15, 2011, after holding a *Curcio* hearing on the eve of trial, Judge Seybert "directed Froccaro to review the jury selection questionnaires with Petitioner to ascertain the type of jury Petitioner would like impaneled." *See* ECF No. 520 at p.22 (*citing* 3/15/2011 Tr. 40:13-21, ECF No. 464-4). Judge Seybert explicitly commanded, as follows:

THE COURT: I'll see you folks, I'll certainly hear from you, you'll be able to visit with Mr. Tarantino and go through the jury selection questionnaires.
MR. FROCCARO: I don't know if we'll have time to do that.
THE COURT: So you're definitely going to do that beforehand and see what his desires would be in terms of the type of jury he'd like to be seated.
MR. FROCCARO: Yes, your Honor.

On March 17, 2011, Judge Seybert held the first telephone conference to pre-screen the jurors. On March 21, 2011, Magistrate Tomlinson held the second telephone conference to finish the pre-screening. Court and counsel participated, and Tarantino's absence was not addressed at either conference. (*See* 3/17/2011 Tr., ECF No. 468-6; 3/21/2011 Tr., ECF No. 483). The Court <u>***never***</u> informed Tarantino that he had the right to be present during the pre-screening of jurors for cause, and the trial court <u>***never***</u> obtained a knowing waiver of his right to be present on the record.

1

On March 22, 2011, before trial jury selection started in open court, Judge Seybert assumed counsel followed her order to "visit with" Tarantino to review all of the juror questionnaires. (*See* 3/22/2011 Tr. 8:16-17, ECF No. 467) ("All these questionnaires were reviewed by you folks last week."). However, as evidenced for the first time in Tarantino's Affidavit in support of his Petition, Froccaro "never met" with him to review the questionnaires (Affidavit, ECF No. 505-2, at ¶ 2), disregarding the Court's direct command.

The Court misapplied the "so-called mandate rule" to procedurally bar Tarantino's ineffective assistance of counsel claim, pointing to the decision of the Second Circuit on direct appeal, when there was no evidentiary record to establish that Froccaro had deliberately disregarded the trial judge's order. The panel held that Tarantino "impliedly waived his right" to be present:

**On this record**, it is apparent that Tarantino waived his right to be present. *See Cohen v. Senkowski,* 290 F.3d 485, 492-93 (2d Cir. 2002); *Tankleff v. Senkowski*, 135 F.3d 235, 247 (2d Cir. 1998) ("Under the circumstances, we think waiver may properly be inferred from the conduct of the defendant and his attorneys."); *see also United States v. Jones*, 381 F.3d 114, 122 (2d Cir. 2004) (finding waiver even though the defendant did not have advance notice of the proceeding in question, as the "defendant could have objected after the alleged violation took place").

*See United States v. Tarantino*, 617 Fed. Appx. 62, 64-65 (2d Cir. 2015) (emphasis added). Froccaro did not object to avoid revealing his contempt. *See* 18 U.S.C. § 401 (federal court can impose fine and/or imprisonment for disobeying a command). Tarantino believed a counseled defendant cannot object unless the court speaks directly to him. *See* Affidavit, *supra*, at ¶ 3.

There should be no dispute that counsel's representation fell below an objective standard of reasonable representation because his disobedience of the court command constitutes obstruction of justice as a matter of law. *See Pennsylvania v. International Union of Operating Engineers*, 552 F.2d 498 (3d Cir. 1977) (counsel who deliberately disregards direct and explicit orders of trial judge offends the dignity and authority of court and obstructs justice, even if pursuing course counsel determines to be in best interest of his client).

Judge Seybert disposed of the ineffective assistance of counsel claim without a § 2255 hearing by holding that the "so-called mandate rule bars re-litigation of issues already decided on direct appeal." ECF No. 520 at p.22 (*citing Yick Man Mui v. United States*, 614 F.3d 50, 53 (2010) and *Burrell v. United States*, 467 U.S. 160, 165 (2d Cir. 2006)) (relying on the mandate rule to procedurally bar ineffective assistance of counsel claims raised in *habeas* petitions where factual predicates of claims were resolved on direct appeal). The ineffectiveness of counsel claim on this issue was "rejected as barred."

The procedural bar was misapplied as this Court did not have access to the factual predicate of the ineffective assistance of counsel claim during the direct appeal since the factual predicate for the ineffectiveness claim on this issue was supported by evidence for the first time in the § 2255 Petition. Tarantino did not raise an ineffective assistance of counsel claim on appeal as first trial counsel's disobedience of the order was then *dehors* the record.

3

Obstruction of justice as a matter of law is *per se* deficient performance, and typical prejudice analysis cannot be applied where trial counsel committed an obstruction of justice and chargeable contempt of court right at the start of a jury trial, thereby causing ***structural error of constitutional magnitude***.

It is a well-settled principle of constitutional law that a criminal defendant has the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."

*See Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) (*quoting Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)). This Court explicitly held that "pre-screening of prospective jurors is a material stage of trial at which the defendant has a constitutional right to be present." *Cohen*, 290 F.3d at 489. A defendant's "life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors." *Id.* (*quoting Lewis v. United States*, 146 U.S. 370, 373 (1892)).

Judge Seybert treated the obstruction of justice as if the structural error was harmless. *See* ECF No. 520 at p.35 ("Petitioner is unable to demonstrate prejudice. Given the overwhelming evidence of the Petitioner's guilt, there is no reasonable probability that but for Froccaro's alleged ineffective assistance of counsel on this issue, that the Petitioner would not have been convicted at trial.") (internal marks and citation omitted). Obstruction of justice, *Pennsylvania, supra,* through disobedience of a direct and explicit court command implicating the constitutional right to be present during pre-screening of jurors for cause constitutes *per se* ineffectiveness not subject to

4

harmless error/prejudice analysis because counsel waived an objection to the deprivation of the right to be present out of his own self-preservation interest, as revealing his disobedience would have exposed him to a contempt charge. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and [ ] we do not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.") (internal quotation marks and citation omitted). The waiver of the fundamental right implied by this Court on direct appeal was tainted by the irreconcilable conflict of Froccaro's own self-interest to not incriminate himself for contempt of court under 18 U.S.C. § 401.

Reasonable jurists could disagree on whether the "Mandate Rule" bars the ineffective assistance of counsel claim based on a new evidentiary record made available to the court for the first time in the § 2255 Petition through the Affidavit of Tarantino, proving that first trial counsel Froccaro disobeyed the explicit order in contempt of court constituting an obstruction of justice as a matter of law, *see Pennsylvania*, *supra*, which deprived Tarantino of his constitutional right to be present during the pre-screening of jurors for cause, and whether a § 2255 hearing should have been held.

***Reasonable Jurists Could Disagree on Whether Counsel Operated Under Actual Undisclosed Benefactor Conflict of Interest that Adversely Affected Trial Performance and Whether a Hearing Should Have Been Held.***

First trial counsel, Froccaro, operated under an undisclosed benefactor conflict of interest that adversely affected his trial performance, as divided loyalties prevented him from pursuing a defense supported by evidence that incriminated Scott Mulligan (Mulligan), who paid for Tarantino's defense. On direct appeal, the Second Circuit preserved this issue for collateral review because the record was not fully developed. *See United States v. Tarantino*, 617 Fed.Appx. 62, 65-66 (2d Cir. 2015). Facts previously *dehors* the record proving Froccaro's **simultaneous** representation of his benefactor Mulligan and Tarantino, which adversely affected his performance, were introduced for the collateral review. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (the petitioner must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). The affirmation filed by civil lawyer Eliza Stahl (Stahl) fleshed out the conflict under which Froccaro operated. Stahl averred that Froccaro **simultaneously** represented Mulligan before and during the first trial, after receiving a $150,000 check and $150,000 in cash arranged by Mulligan. Stahl averred that Froccaro did not deny destroying an extortion letter sent by Vincent Gargiulo (Gargiulo) to Mulligan's home, showing both Mulligan's motive to hire Gargiulo's murder and Froccaro's complicity with Mulligan. *See* Affirmation, ECF No. 505-1, at ¶¶ 3, 5, 7-13; *id*. at p.6 ($150,000 check dated 10/3/2008, days after Tarantino's arrest).

6

Stahl's highly detailed affirmation was mistreated as "conclusory." *See* ECF No. 520 at pp.19-20 ("Petitioner is unable to demonstrate that Froccaro operated under an actual conflict. Stahl's affirmation does not establish that Froccaro was [sic] simultaneously represented Mulligan and Petitioner; instead, in a conclusory fashion, she states that Froccaro was representing Mulligan between 2008 and 2011."); **but compare** Affirmation, ECF No. 505-1, at ¶ 2 (Stahl assisted Froccaro at Tarantino's request during 2008-2011); *id.* at ¶ 5 (Froccaro and Stahl had "numerous conversations" during 2008-2011 in which Froccaro acknowledged he was also representing Mulligan while representing Tarantino; Froccaro "regularly consulted" with Mulligan and referred to him as a client); *id*. at ¶ 7 (Froccaro shared evidence with Mulligan from the case, including the tape that was the main evidence against Tarantino, without Tarantino's permission, and Stahl mentioned to Froccaro in his office that she did not think Froccaro should have played the tape for Mulligan); *id*. at ¶ 8 (during a phone call in 2011, after *Mastrangelo* hearings which Stahl did not attend, Froccaro told Stahl that he had "cleared Scott" and Stahl believed this was in reaction to case agent testimony that Mulligan's MtDNA had been excluded); *id*. at ¶¶ 10-11 (Mulligan's wife forwarded the extortion letter received from Gargiulo in January 2003 to Froccaro through another individual; on one occasion when Froccaro and Stahl discussed the blackmail issues in the case, Stahl mentioned she heard Froccaro destroyed said letter, and Froccaro did not deny the allegation).

7

Section 2255 provides that a court shall hold an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. In *Chang v. United States*, 250 F.3d 79 (2d Cir. 2001), this Court made clear that a court may appropriately rule on a § 2255 petition without holding a testimonial hearing where (1) the allegations of the motion, accepted as true, would not entitle the petitioner to relief or (2) the documentary record, including supplementary submissions such as affidavits, would render a testimonial hearing unnecessary. *See Chang,* 250 F.3d at 84-86. The highly detailed affirmation submitted by civil lawyer Stahl under the penalty of perjury, *see* ECF No. 505-1, accepted as true, would entitle Tarantino to relief based on the undisclosed benefactor conflict and the **simultaneous** representation. Rather than hold the hearing required by § 2255 to test the credibility of Stahl and Froccaro in the crucible of cross-examination, the court even accepted a conclusory denial by Froccaro, while she mistreated Stahl's highly detailed, legally sufficient affirmation as "insufficient to demonstrate" the conflict.

> Stahl's affirmation includes a statement suggesting Froccaro may have destroyed Garguilo's blackmail letter to Mulligan (hereafter, the "Letter"). …After Mulligan became a cooperating witness, he waived attorney-client privilege to allow Froccaro to respond to a government *subpoena* seeking production of the Letter. Froccaro's response was that he never received it. (*See* ECF No. 357 at 3 n.1.) Thus, Stahl's affirmation is insufficient to demonstrate that Froccaro's interests diverged from those of his client, Petitioner.").

ECF No. 520 at p.19, n.8. The court should have held a testimonial hearing.

Stahl's revelations of the undisclosed simultaneous representation of Mulligan and Tarantino and the destruction of evidence are fully consistent with the contempt of court committed by Froccaro in disobeying a direct and explicit court command, which constitutes obstruction of justice as a matter of law. *See* Argument at pp. 1-5 (Froccaro's disobedience of court command constituted contempt and an obstruction of justice that deprived Tarantino of his right to be present during the pre-screening trial jurors for cause).

Mulligan was implicated in all offenses charged against Tarantino, but Froccaro failed to inculpate benefactor Mulligan despite evidence that would have ***compelled*** conflict-free counsel to shift the blame to Mulligan in order to create a reasonable doubt as to Tarantino's culpability. The valid examples provided by Tarantino of evidence that would have been properly utilized by conflict-free counsel to shift the blame to Mulligan were invalidated by the district court. *See* ECF No. 520 at p.21 ("Even assuming *arguendo* that an actual conflict existed, Petitioner's alternate defense strategy is simply not plausible. Petitioner proffers examples of opportunities where Froccaro could have shifted the blame for Baumgardt and Dorval's murders to Mulligan; however, the evidence elicited at trial does not support Petitioner's argument. Rather, the trial evidence demonstrated that Petitioner and Mulligan were, in fact, co-conspirators rather than alternative suspects in the murders. (Tr. 624:19-23, 638:21- 639:5, 640:1-14, 902:21-903:14, 908:1-7, 1187:19-23, 1191:15- 1193:5, 1198:7-1199:9.)").

9

However, these pages of the first trial record cited to foreclose relief do not support the proposition that the first "trial evidence demonstrated that Petitioner and Mulligan were co-conspirators rather than alternative suspects in the murders." *See* ECF No. 520 at p.21 (plural "murders" in the original) (*citing* "Tr. 624:19-23" (testimony about shotgun purchase, but no reference to the proposition), "638:21-639:5" (same); "640:1-14" (same); "902:21-903:14" (Detective testifying that he identified Mulligan departing storage facility on June 24, 1994, where and when weapons used in June 23, 1994 robbery were discovered, but no reference to the proposition); "908:1-7" (Detective testifying about items found in canvas bag inside storage unit, but no reference to the proposition); "1187:19-23" (Gaetano Fatato testifying that Dorval said Tarantino and Mulligan were surveilling an armored car with him); "1191:15-1193:5" (Gaetano Fatato testifying that Dorval said that he shot the guard accidentally and that Tarantino wore a mask during robbery and assisted Dorval); "1198:7-1199:9" (Gaetano Fatato testifying that he met Tarantino, Mulligan and Dorval at a pizzeria for a marijuana transaction and, while alone with Tarantino, questioned him about the armored car; Tarantino gave him a "cold kill stare, like, I don't know what you're talking about."). The only testimony supporting the proposition that Tarantino and Mulligan were co-conspirators in the armored car robbery came from Gaetano Fatato, whose veracity was described by Judge Jack Weinstein as "so slender as to suggest the court wouldn't believe him." *See* ECF No. 510, Exhibit Q.

10

Tarantino provided particular examples of evidence that would have properly **compelled** conflict-free counsel to shift blame to Mulligan as to all of the charges, not just the counts involving victims Baumgardt and Dorval. ECF No. 520 at p.15 ("Petitioner contends that Froccaro failed to shift blame to Mulligan for the Baumgardt and Dorval murders because of this conflict"). *See* ECF No. 510 at pp.7-8 (As to Count One charging the robbery which resulted in the death of security guard Julius Baumgardt, Froccaro knew that Mulligan was a target/suspect as of 1994, and conflict led to prejudicial error at trial as Froccaro failed to elicit the description which strongly suggested Mulligan played a part in the robbery instead of Tarantino, and **objected** to evidence linking Mulligan to the cache of weapons used during the robbery) (attaching Exhibit I (February 16, 2011 transcript) at p.361 (FBI file showed Mulligan was target/suspect in Baumgardt and Dorval murders as of 1994); *id*. at p.363 (Mulligan's DNA *subpoenaed*); Exhibit J (FBI agent affidavit) at pp.3-4, ¶4 & n.4 (two (2) witnesses who were standing "a few feet" from the robbery saw two (2) assailants; one of the assailants was Louis Dorval, and Mulligan fit the description of the other assailant who wielded a shotgun, identically matching his height ("six-foot-one-inch") and "heavy build"); and Exhibit K (March 30, 2011 transcript) at pp.899-901 (Froccaro **objecting** to testimony that **Mulligan** was seen entering storage unit on June 24, 1994, where weapons used during June 23, 1994 robbery were found); *id*. at p.932 (Tarantino was never seen at storage facility)); *see also* ECF No. 510 at p.8

11

(As to Count Two charging obstruction of justice murder of Louis Dorval, who was found floating at sea in a toolbox trunk ***days after*** his indictment with several Lucchese crime family members in August of 1994,[1] Froccaro knew that Mulligan was a target/suspect in that murder as of 1994) (attaching Exhibit I (February 16, 2011 transcript) at p.361 (FBI case file showed Mulligan was target/suspect in that murder as of 1994)); ECF No. 510 at p.8 (once trial evidence proved that one Joseph Pistone committed that murder, prosecutor stated in summation that Tarantino aided and abetted that murder) (attaching Exhibit E (May 4, 2011 transcript) at p.3065); ECF No. 510 at pp.8-9 (Froccaro argued in his Rule 29 motion to acquit that tape of the talk between Vincent Gargiulo (Gargiulo) and Tarantino "more appropriately" showed an "accessory after-the-fact.") (attaching Exhibit L (April 27, 2011 transcript) at p.2793); ECF No. 510 at p.9 (During deliberations, jury focused on the tape portion implicating Tarantino in disposing of the corpse at sea) (attaching Exhibit M (May 9, 2011 transcript) at pp.3211, 3213 (trial court reading jury's request to hear tape at parts pertaining to disposal of trunk and injury to finger; portion of the tape played and replayed on request of jury)).

---

[1] At the *Curcio* hearing conducted days before the first trial started, Froccaro claimed that another conflict of interest (*i.e.*, his simultaneous representation of Lucchese crime family members who had taken full credit for committing murder of Dorval charged against Tarantino) "honestly slipped [his] mind." *See* ECF No. 510, Exhibit G (March 15, 2011 transcript) at p.5. Froccaro failed to disclose his benefactor conflict and simultaneous representation of Mulligan before and during the trial. *See* Stahl Affirmation, ECF No. 505-1.

Froccaro rendered woefully ineffective assistance in failing to request a theory of defense instruction given the centerpiece tape evidence sufficient to acquit Tarantino as an aider and abettor. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) (defendant entitled to instruction as to any recognized defense supported by evidence sufficient for reasonable jury panel to acquit). A reasonable jury panel could have easily found that Mulligan was the more culpable aider and abettor, while Tarantino was an accessory after-the-fact who did no more than dispose of the corpse at sea after-the-fact of the murder committed by Joseph Pistone in a vehicle, as fully corroborated by the FBI.[2] Portions of the taped conversation between Tarantino and Gargiulo would have ***compelled*** conflict-free counsel to shift the greater blame to Mulligan as a principal. Gargiulo criticized "Scott" (Mulligan) for going "on the lam." *See* ECF No. 510, Exhibit N (trial exhibit RS-39) (tape transcript) at p.6. Froccaro ignored Tarantino's taped response that Mulligan was "not a saint in all of this. You're taking X amount of time. And I'm taking X." *Id*. Froccaro irrationally argued the tape admitted as evidence lacked integrity.

---

[2] *See* ECF No. 510, Exhibit I at pp.450-454 (FBI case agent testifying that AUSA represented to a federal judge that Peter Pistone was inside car where he saw his brother Joseph Pistone shoot Dorval in the head with a revolver; FBI case agent also confirming that bullet came from a revolver according to ballistics test; FBI case agent confirmed that car had been damaged from weight of corpse as reported; FBI case agent confirmed that car was returned to Joseph Pistoneʹs girlfriend with new interior as reported, and that it had been a relative of the Pistones who had installed brand new interior).

13

Conflict-free counsel would have argued that Mulligan's flight proved his consciousness of greater guilt as an aider and abettor of the murder of Dorval, and that Tarantino did not flee from the same investigation that had collected his DNA two months earlier, *id*. at p.3, since he knew he was a less culpable accessory after-the-fact. The consensus recorded on tape was consistent with Mulligan's greater culpability. *Id*. at p.18 (Gargiulo: "You know what the bad thing is SCOTT going on the run. He makes you guys look so bad though ...As soon as you guys get busted, they're going to find SCOTT in no time. ...Because you know how much media they'll put on him. ***He'll be number one's most wanted***. He won't be able to move. Tarantino: ***Right***, ***right***") (emphasis added). Froccaro failed to use the tape to inculpate Mulligan as the aider and abettor and exculpate Tarantino as the accessory-after-the-fact.

Froccaro would have been entitled to a theory of defense instruction charging jurors with the duty to acquit Tarantino as an aider and abettor, *if* they found that the evidence only proved beyond a reasonable doubt that he was an accessory after-the-fact. The theory was supported by tape evidence, but Froccaro did not request the instruction. Froccaro raised the point in his Rule 29 motion, but he did not request the valid theory of defense instruction. *See United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) (distinguishing the criminal conduct of accessories after-the-fact *vis-à-vis* aiders and abettors to conclude that the defendants were accessories after-the-fact that could not be convicted as aiders and abettors in a case involving stolen merchandise).

14

When Froccaro submitted that the tape "more appropriately" showed Tarantino as an accessory after-the-fact, the prosecution responded that the trial testimony of Gaetano Fatato (Fatato) supported "a fair inference that Mr. Dorval was last with Mr. Tarantino before his death." *See* ECF No. 510, Exhibit L (April 27, 2011 transcript) at p.2797. Fatato's testimony[3] posed no impediment to instructing the jury to acquit if it concluded that the evidence only proved Tarantino was an accessory after-the-fact of Dorval's murder ECF No. 510, Exhibit N (trial exhibit RS-39) (tape transcript) at pp.20-21 (Tarantino only discussed disposal of Louis Dorval's corpse in the ocean). There is a strong probability that the jury would have acquitted if Froccaro had sought the theory of defense instruction. Froccaro had an actual conflict that adversely affected his defense of Tarantino due to his divided loyalties. Froccaro's deficient performance in failing to request the theory of defense instruction was clearly prejudicial. *See* ECF No. 510 at p.13 (arguing that failure to seek instruction proved both actual conflict that adversely affected Froccaro's trial performance and his ineffective assistance of counsel) (*citing Cuyler*, *supra*, and *Strickland v. Washington*, 466 U.S. 668 (1984)).

---

[3] During trial, Fatato admitted that he had given different versions of his last contact with Dorval. *See* ECF No. 510, Exhibit P (April 5, 2011 transcript) at pp.1335-1337 (Fatato told FBI Agent on September 13, 1994, one month after Dorval's death, different version compared to his 2011 trial testimony). Fatato's veracity has been aptly described by a renowned expert on evidence. *See* ECF No. 510, Exhibit Q (Judge Jack B. Weinstein stating that Fatato's "veracity is so slender as to suggest the court wouldn't believe him.'").

15

As to Counts Three and Four charging Tarantino with conspiring to commit the obstruction of justice murder of Vincent Gargiulo (Gargiulo) and with the obstruction of justice murder of Gargiulo that occurred in Manhattan on August 18, 2003, Froccaro had previously destroyed the extortion letter mailed by Gargiulo to Mulligan's home in 2003 at a time when Froccaro had represented Mulligan in a previous drug prosecution. *See* Stahl Affirmation, ECF No. 505-1. Irrespective of the alleged destruction of evidence, which Froccaro did not deny to Stahl upon inquiry, *id*., Froccaro failed to inculpate Mulligan with evidence that would have compelled conflict-free trial counsel to shift blame to Mulligan as having hired the murderer of Gargiulo to create a reasonable doubt as to Tarantino's culpability. This was a ***hired murder***.

Although Scott Mulligan was a partner in all of the Synergy gyms, Froccaro failed to elicit that fact to show that Mulligan was also a "boss" to Justin Bressman who was portrayed as the murderer hired by "Matty Roth," his "boss" at Synergy gyms. *See* ECF No. 510, Exhibit V (April 25, 2011 transcript) at pp.2332-36 (CPA Scott Flynn, accountant for Synergy gyms, not asked by counsel if Mulligan a Synergy gym owner); *see id*., Exhibit W (May 2, 2012 transcript) at pp.1122-24 (CPA Flynn revealing during retrial cross-examination that gym [where Bressman worked] was owned and operated by Brett Holzer and Eric Holzer); *see id.,* Exhibit X (May 7, 2012 transcript) at p.1547 (Mulligan was a partner in all of the Synergy gyms); *id*. at p.1654 (Mulligan admits that he was also one of Bressman ́s gym bosses).

Mulligan had a motive to send word to hire the murderer, and he was also one of Bressman's gym "bosses," but Froccaro allowed the jury to believe Tarantino was Bressman's only "boss." All of Froccaro's omissions favored Mulligan, who was "next on the chopping block" as stated by the prosecutor early during trial. *See* ECF No. 510, Exhibit Y (April 7, 2011 transcript) at p.1627; Exhibit V at p.2372 (FBI agent reading letter from Gargiulo seeking "reward for information and audiotapes leading to the arrest and conviction of Scott Mulligan, Chris Tarantino and others in the 1994 armored car robbery where a guard was shot dead, and the death of one of the robbers named Louis was also shot dead and found floating off Long Island"); *see also* Stahl Affirmation, ECF No. 505-1 (Froccaro did not deny destruction of extortion letter sent by Gargiulo to Mulligan's family home when asked).

Reasonable jurists could disagree on whether Froccaro operated under an actual undisclosed benefactor conflict of interest that adversely affected trial performance and whether a testimonial hearing should have been held.

17

***Reasonable Jurists Could Disagree on Whether First Trial Counsel and Re-Trial Counsel were Ineffective for their Failure to Object at Trial to Inadmissible Evidence: (1) Post-Mortem Statements Not Made in Furtherance of Alleged Completed Murder Conspiracy and (2) Attorney Roth's Identification Testimony Providing the Last Direct Link to Convict Tarantino, His Client, and Whether a Hearing Should Have Been Held.***

## Deficient Performance of Counsel and Prejudice

Tarantino raised the ineffectiveness of both his first trial counsel and retrial counsel in not objecting to the introduction of inadmissible evidence as to Counts Three and Four, charging Tarantino with conspiring to commit the obstruction of justice murder of one Vincent Gargiulo (Gargiulo) and the obstruction of justice murder of Gargiulo in Manhattan on August 18, 2003.

Tarantino argued extensively that ***first*** trial counsel was ineffective for failing to object to the admissibility of (1) *post-mortem* statements not made in furtherance of alleged completed murder conspiracy and (2) identification testimony at trial by the lawyer who had represented him in the same case, providing the last direct link in the chain of evidence to convict Tarantino, without which there was insufficient evidence. *See* ECF No. 510 at p. 13:

Even if Froccaro had not clearly operated under an actual conflict, prejudicial error was committed. Froccaro failed to object to inadmissible hearsay ***and*** failed to preclude Petitioner's former attorney Melvyn Roth (Roth) from providing the "***direct link***" to convict Petitioner at trial as the gym owner known as "Matty Roth," who allegedly conspired to murder Gargiulo. ***But for the inadmissible post-mortem hearsay*** *or* ***the trial testimony of Petitioner's former attorney that should have been precluded, there was insufficient evidence, requiring final acquittals that would have barred the retrial held on these mistried counts under the double jeopardy clause***.")

(emphasis in original).

18

The first trial evidence was insufficient to convict Tarantino without the inadmissible testimony of his own lawyer, who provided identification testimony that constituted "direct linkage" in the chain of evidence used to convict. Attorney Roth testified under Judge Seybert's threat of contempt. Judge Seybert overlooked or she was willfully blind to the argument that Froccaro rendered ineffective assistance in failing to object to Tarantino's lawyer (in the same case) providing last direct link testimony ***without which Rule 29 acquittals were required as to Counts 3 and 4, barring retrial under double jeopardy clause principles***. *See United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 505 (2d Cir. 1991) (special circumstances under which client identity would be privileged exist when disclosure of client-identifying information would directly incriminate the client by providing direct linkage in an existing chain of evidence presented against client).

Even if the *post mortem* hearsay incorrectly introduced at trial under Rule 801(d)(2)(E), Fed.R.Evid., as statements during the course of and in furtherance of a conspiracy, were nonetheless admissible under Rule 804, Fed.R.Evid., due to the unavailability of alleged hired killer Justin Bressman (Bressman), without attorney Roth identifying Tarantino as the person who contacted him regarding the police questioning of Bressman, there would have been insufficient evidence to convict him. Without that last direct link client-identifying testimony added to the chain of evidence (*i.e.*, attorney Roth identifying Tarantino as party who called him about police questioning

19

linked to statement by Bressman that "Matty Roth" who hired him to murder Gargiulo arranged for an attorney to intervene during his police questioning), Tarantino would have been entitled to final Rule 29 acquittals, barring retrial under double jeopardy clause principles.

Judge Seybert only addressed the same arguments of ineffectiveness made as to retrial counsel ultimately finding that the testimony of Tarantino's own lawyer (in the same case) was "corroborative" of other retrial evidence. *See* ECF No. 520 at pp.28-29 ("Roth's testimony was not the last direct link, but rather corroborative of other evidence establishing Petitioner's guilt. Therefore, the disclosure of Petitioner's client identity was not privileged and was properly admitted in this case. Thus, it follows that retrial counsel's performance was not deficient for failure to object to proper testimony."). To the extent the court relied on ***unidentified*** "other evidence" presented by the prosecution only at the retrial, such as Mulligan's self-serving testimony, that "other evidence" was never presented at the first trial and the analysis of the chain of evidence at the first trial cannot be distorted by conflating the records of the first trial and the retrial. At the first trial, without the testimony of attorney Roth, there was insufficient evidence of Tarantino's guilt, ***and the government is challenged to particularize the "other evidence" of guilt as to Counts 3 and 4 during <u>the first trial</u> and the retrial for comparison***. Accepting Tarantino's allegations as true, a hearing should have been held.

20

Reasonable jurists could disagree on whether first trial counsel and retrial counsel were ineffective for their failure to object to inadmissible testimonial evidence and whether a hearing should have been held.

### *Reasonable Jurists Could Disagree on Whether the District Court Failed to Address Specific Conflict and Ineffective Assistance of Counsel Claims and Whether a Hearing Should Have Been Held.*

Judge Seybert either overlooked or she was willfully blind to specific conflict and ineffective assistance of counsel claims. *See Rhode v. United States*, 583 F.3d 1289 (11th Cir. 2009) (because the district court failed to address petitioner's § 2255 claim that counsel was ineffective for failing to file a motion to withdraw his guilty plea, the court vacated the district court's judgment and remanded to the district court for consideration of that claim) (*following Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (*en banc*)).

As noted herein, Judge Seybert overlooked or she was willfully blind to the argument that Froccaro (not only retrial counsel) was ineffective for failing to object to inadmissible evidence (*i.e.*, the *post-mortem* statements not made in furtherance of the alleged murder conspiracy and attorney Roth's identification testimony providing last direct link in the chain of evidence), which would have resulted in final Rule 29 acquittals at the first trial for insufficient evidence, barring retrial under double jeopardy clause principles as to Counts 3 and 4. ECF No. 510 at pp.13-20. In addition, Judge Seybert overlooked or she was willfully blind to the argument that Froccaro failed to shift blame to Mulligan for Gargiulo's murder due to his actual undisclosed

21

benefactor conflict, as the court addressed only the contentions that Froccaro failed to shift blame to Mulligan as to the robbery resulting in the death of Baumgardt and as to Dorval's murder. *See* ECF No. 520 at p.15 ("Petitioner contends that Froccaro failed to shift blame to Mulligan for the Baumgardt and Dorval murders because of this conflict; therefore, Froccaro operated under an actual conflict"); *compare* ECF No. 510 at p.19 (omissions by Froccaro despite evidence that would allow shifting blame to Mulligan as to Gargiulo's murder). Finally, Judge Seybert also overlooked or she was willfully blind to the conflict and ineffective assistance of counsel claims raised as to Froccaro's failure to seek a defense theory instruction, supported by the tape evidence, charging the jury with the duty to acquit if they found that the evidence only proved beyond a reasonable doubt that Tarantino was an accessory-after-the-fact. *See* ECF No. 510 at pp.11-12 (tape evidence that would have compelled conflict-free counsel to shift blame to Mulligan as the aider and abettor in Dorval's murder, while exculpating Tarantino as the accessory after-the-fact who only disposed Dorval's corpse at sea); *see also* ECF No. 510 at p.13 (alternative conflict and ineffectiveness claims) (*citing Cuyler v. Sullivan*, 466 U.S. 335 (1980); *Strickland v. Washington*, 466 U.S. 668 (1984) in support of alternative arguments).

Reasonable jurists could disagree on whether Judge Seybert failed to address specific conflict and ineffective assistance of counsel claims raised and whether a hearing should have been held.

***Reasonable Jurists Could Disagree on Whether the "Mandate Rule" Bars the Ineffective Assistance of Counsel Claim Based on a Factual Predicate that Both First Trial Counsel and Re-Trial Counsel Misadvised Tarantino that his Testimony at a Suppression Hearing Would be Used Against Him at Trial and Whether a Hearing Should Have Been Held.***

### Deficient Performance of Counsel and Prejudice

[Tarantino] proffers he was ***the only witness*** competent to testify that Gargiulo ***did*** begin to extort cash from [Tarantino] with the threat of disclosure of the tape to police shortly after he taped it, ***evidencing his contemporaneous intent to misuse the tape to extort from the outset***, but counsel unreasonably failed to present [Tarantino]'s testimony in support of their motions to suppress the incriminating tape, *unreasonably misadvising* him that his proposed pretrial testimony *would be used against him at trial on the issue of guilt*, contrary to *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("when a defendant testifies in support of a motion to suppress evidence..., his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection"). Under these unique circumstances, where Petitioner was an indispensable witness to establish a dispositive fact that would require suppression of the tape evidence, the ineffectiveness of all defense counsel in denying him his absolute personal right to testify in support of his motion to suppress the tape infected both trials and raises a fundamental issue of constitutional magnitude. The outcomes of both trials were tainted by the inadmissible tape used by Gargiulo to extort Tarantino, starting shortly after it was made. The denial of the right to testify to suppress linchpin evidence is as egregious as a denial of the right to testify at trial.

At a minimum, Tarantino is entitled to an evidentiary hearing pursuant to 28 U.S.C. §2255 to testify in support of this claim and to establish by a preponderance of the evidence that Gargiulo's primary motivation, or that a determinative factor in Gargiulo's original motivation for recording the conversation, was to commit a criminal or tortious act, which would have required suppression of linchpin evidence. If the reviewing court considers the proffered testimony of Tarantino on the limited issue of Gargiulo's intent to misuse the tape to extort cash from the outset, within the context of all other evidence probative of his intent to misuse the tape to extort cash (even later trying to extract $500,000 from the FBI), then it should conclude that counsel rendered ineffective assistance, even if the recording also "cleared" Gargiulo from involvement in the crimes discussed during the conversations.

ECF No. 510 at pp.29-30 (emphasis in original; brackets added).

23

Judge Seybert either misunderstood, or she was willfully blind to the proffered testimony that Gargiulo began to extort Tarantino "***shortly***" after the taping. *See* ECF No. 520 at p.31 ("Petitioner's proffered testimony does not provide any new evidence to the Court.") (***not*** *citing* any part of the case record to support that Tarantino's testimony had been previously proffered); www.merriam-webster.com/thesaurus/shortly (listing "momentarily" and "presently" as "synonyms" for "shortly"; listing "forthwith, immediately, …instantaneously, instantly, now, promptly, pronto, right away, right now, right off, straightaway, straightway" as "words related to shortly"). Accepted as true, the proffered testimony would entitle Tarantino to relief, as the law strictly mandates suppression of the tape if the recording was made with the "***contemporaneous***" intent to extort cash, ***which the district court seems to misunderstand as requiring some evidence of a "simultaneous" intention to extort*** <u>***announced***</u> ***to Tarantino within the hour of the tape recording***.

18 U.S.C. § 2511(1) prohibits the disclosure and use of intercepted wire, oral or electronic communications. An exception is found in § 2511(2):

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception ***unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.***

18 U.S.C. §2511(2)(d) (emphasis added).

24

The proffered testimony of Tarantino meets the burden of proving by a preponderance of the evidence "either (1) that the primary motivation, or (2) that a determinative factor in [Gargiulo's] motivation for intercepting the conversation was to commit a criminal [or] tortious ... act." *See In re DoubleClick Inc. Privacy Litigation*, 154 F.Supp.2d 497, 514-515 (S.D.N.Y.2001) (*quoting United States v. Vest*, 639 F.Supp. 899, 904 (D.Mass.1986)) (brackets added); *id*. at 907 (defendant bears burden of proof by preponderance of the evidence). The proffered testimony that Gargiulo began to extort Tarantino "***shortly***" after making the tape clearly entitled him to a hearing, as the act of surreptitiously taping followed "***shortly***" by the act of extorting cash with a threat of disclosure of the tape to the police show "acts accompanied by a ***specific contemporary intention*** to commit a crime or tort." *Id*. at 515 (emphasis added). In reviewing the sufficiency of the testimony that Gargiulo began extorting Tarantino "***shortly***" after the taping, along with the mixed motives of Gargiulo, Judge Seybert overlooked that "[t]he existence of [a] lawful purpose would not sanitize a tape that was also made for an illegitimate purpose; the taping would violate section 2511." *See Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir. 1999) (brackets added). Trial evidence only showed part of the chronology – Gargiulo's 2002-2003 attempts to extract more monies from Tarantino, and $500,000 from both Mulligan and the FBI, consistent with the cash he extorted from Tarantino, starting "***shortly***" after the tape was recorded in or about September 2000.

During direct appeal, this Court did not have the testimony proffered for the first time in the § 2255 Petition, which fills the temporal gap in the chronology to prove Gargiulo began extorting cash from Tarantino "***shortly***" after the taping in or about September 2000. *Tarantino*, 617 F.App'x at 65 ("Although Gargiulo later used the recording for blackmail, it is far from clear that blackmail was his "primary motivation" or "a determinative factor" at the time he made the recording") (noting that court "specifically afforded Tarantino an opportunity to come forward with additional information in support of his request for a hearing"). The testimony proffered for the first time in the § 2255 Petition does "come forward with additional information" that proves Gargiulo's contemporaneous intent to extort at the time of taping, which trial counsel would have presented to the trial court in timely fashion, but for their woefully deficient performance. The prejudice caused cannot be disputed as the tape was the centerpiece evidence at both trials.

Judge Seybert disposed of the ineffective assistance of counsel claim without a § 2255 hearing, holding "the claim is barred by the mandate rule." *See* ECF No. 520 at p.32 (*citing Yick Man Mui,* 614 F.3d at 53) (relying on the mandate rule to procedurally bar ineffective assistance of counsel claims raised in § 2255 petitions where factual predicates of claims were resolved on direct appeal). The procedural bar was misapplied as this Court did not have access to the factual predicate of the ineffectiveness claim on this issue made available for the first time in the § 2255 Petition.

Tarantino did not raise an ineffective assistance of counsel claim on appeal as trial counsel's misadvice that his testimony proffered in support of a pretrial suppression hearing could be used against him during trial was then *dehors* the record. Without a § 2255 hearing, Judge Seybert failed to accept the proffer as true, and mistreated it, as if Tarantino did not, for the first time, "come forward with additional information". *See Tarantino*, *supra*, at 65; *compare* ECF No. 520 at p.32 ("***Despite now proffering his testimony that Garguilo's extortion purportedly began 'shortly' after the tape was made***, all of the alleged corroborating evidence Petitioner now proffers had previously been before this Court and the Second Circuit. As such, re-litigating this issue will not be had, even through the lens of an ineffective assistance claim, as the factual predicate was upheld on direct appeal.") (emphasis added). The Second Circuit did ***not*** have the proffered testimony of Tarantino filling the gap in the chronology, which should be considered together with the corroborating evidence previously in the case record that includes but is not limited to Gargiulos's attempt to extract additional sums of money from Tarantino and $500,000 from both Mulligan and the FBI in 2002-2003, *see* Indictment at ¶14 (alleging that "[i]n or about and between December 2002 and August 2003," Gargiulo threatened Tarantino with providing the tape to law enforcement officers unless Tarantino paid him), and Gargiulo's documented financial hardship ***before*** ***and*** ***after*** the taping. *See* ECF No. 520 at pp.31-38 (collecting all corroborating evidence).

27

Judge Seybert endorsed the argument that "it strains the bounds of credulity to believe that the petitioner never advised his trial or retrial counsel that he could have testified or even offered an affidavit regarding Gargiulo's alleged primary intent." ECF No. 520 at p.31 (*quoting* government counsel). During a § 2255 hearing, Tarantino would offer additional corroborative documentary evidence proving that his retrial counsel had a drafted motion to suppress repeatedly citing Tarantino's Declaration (attached thereto) and that retrial counsel exchanged emails documenting his misadvice that the testimony proffered by Tarantino for a suppression hearing would be used against him during trial, despite being informed by his clerk that his advice to Tarantino was contrary to *Simmons v. United States*, 390 U.S. 377, 394 (1968) (when a defendant testifies in support of a motion to suppress, "his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection").

Reasonable jurists could disagree on whether the "mandate rule" bars the ineffective assistance of counsel claim based on a factual predicate provided for the first time in the § 2255 Petition showing first trial counsel and re-trial counsel misadvised Tarantino that his proffered testimony for a suppression hearing would be used against him at trial, obstructing his absolute personal constitutional right to testify in his own defense to suppress the centerpiece evidence against him, and reasonable jurists could disagree on whether a testimonial hearing should have been held.

***Reasonable Jurists Could Disagree on Whether Retrial Counsel was Ineffective for Failing to Seek Judicial Recusal For Demonstrated Bias and Whether a Hearing Should Have Been Held.***

### Deficient Performance of Counsel and Structural Error

Tarantino submits that retrial counsel rendered ineffective assistance due to his failure to seek the recusal of Judge Seybert based on her bias, given the gross illegality of allowing prosecution retrial witness Scott Mulligan to waive grand jury indictment and accepting a void plea to an information at the request of the government. Judge Seybert ***doubles down*** on blindness to the record, *see* ECF No. 520 at p.23 (*quoting* ECF No. 413 at p.5 ) ("***there was nothing erroneous about the Government's indictment of Mulligan***") (emphasis added), and by her willful blindness to the record and argument that she showed her bias by allowing the ***waiver of a grand jury indictment*** on an offense charged under 18 U.S.C. § 33 and punishable by death under 18 U.S.C. § 34 because the crime resulted in a death, Judge Seybert even provides proof that her bias has tainted her disposition of the § 2255 Petition. Tarantino requested referral of the recusal issue raised in the § 2255 Petition to the Chief Judge of the Eastern District of New York. *See* ECF No. 510, p.12, n.9 (*citing United States v. Craig*, 853 F.Supp. 1413 (S.D.Fla. 1994) (following long-term policy of referring recusal motions to Chief Judge of the District)), but the court chose to further display her willful blindness. *Cf., Carter v. Anderson*, 585 F.3d 1007, 1011 (6th Cir. 2009) (willfull blindness to the truth is an element of a fraud on the court).

29

Judge Seybert impermissibly permitted the prosecution retrial witness to waive a grand jury indictment on a capital offense punishable by death, which expeditiously secured the witness for the prosecution on the eve of the then scheduled retrial date, January 9, 2012. Judge Seybert showed her "deep-seated favoritism or antagonism" on January 3, 2012, by unlawfully accepting a waiver of grand jury indictment on a capital offense and a plea to an information, deliberately disregarding the Fifth Amendment, Rule 7, Fed.R.Crim.P., and binding caselaw. *See* Fifth Amendment ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a  presentment or indictment of a Grand Jury..."); Rule 7(a), Fed.R.Crim.P. ("An offense which may be punished by death shall be prosecuted by indictment"); *United States v. Macklin*, 523 F.2d 193, 196, n.3 (2d Cir. 1975) ("offense punishable by death requires prosecution by indictment regardless of defendant's waiver"). In accepting the null and void negotiated plea to an information, the court acted ***without jurisdiction***.  *See Kees v. United States*, 304 F.2d 661, 663 (7th Cir. 1962) ("Because we conclude that the offense charged was a capital offense, we decide that Rule 7(a) gives no support to the district court's assumption of jurisdiction ...the court had no jurisdiction to try the alleged violation … by information."). The  willful blindness of the judge to the record and to gross illegality of a waiver of grand jury indictment on a capital offense and acceptance of a void plea to an information, while acting without jurisdiction, proves "deep-seated favoritism or antagonism."

30

*See Liteky v. United States*, 510 U.S. 540, 555 (1994) (recusal for appearance of partiality required if court decision displays "a deep-seated favoritism or antagonism that would make fair judgment impossible"). Tarantino submits that bias requiring recusal must be presumed from such willful blindness.

Petitioner had a fundamental constitutional right to an unbiased judge, and the failure of ineffective retrial counsel to seek recusal caused structural error which requires vacating the only conviction obtained after the retrial. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991) ("trying a defendant before a biased judge" is listed among those "constitutional errors that could not be categorized as harmless error"). Prejudice need not be shown where Judge Seybert had a mandatory duty to recuse herself since January 3, 2012. *See* 28 U.S.C. § 455(a) (judge "shall disqualify h[er]self in any proceeding in which h[er] impartiality might reasonably be questioned."); § 455(b)(1) ("[Sh]e shall also disqualify h[er]self in the following circumstances: Where [s]he has a personal bias or prejudice concerning a party") (brackets added).

Accepting all allegations as true, Tarantino was entitled to a hearing, *see Chang v. United States*, 250 F.3d 79, 84-86 (2d Cir. 2001) (district court may appropriately rule on a § 2255 petition without holding a hearing where (1) the allegations of the petition, accepted as true, would not entitle the petitioner to relief or (2) the documentary record, including supplementary submissions such as affidavits, would render a hearing unnecessary), and the Second Circuit should remand the case to a new randomly selected judge.

31

Reasonable jurists could disagree on whether retrial counsel rendered ineffective assistance by failing to seek mandatory judicial recusal for the demonstrated bias, including willful blindness to the record and the gross illegality, and whether a hearing should have been held.

## PRAYER FOR RELIEF

Given the denial of constitutional rights, a certificate of appealability should be granted as to all the issues raised in this application.

/s/ Todd G. Scher
Todd G. Scher, Esq.
Florida Bar No. 899641
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, Florida 33020
Tel: 754-263-2349
Fax: 754-263-4147
tscher@msn.com
Counsel for Movant-Appellant

## Certificate of Word Count, Typeface and Type-Style Requirements

I, Todd G. Scher, an attorney, HEREBY CERTIFY as follows:

1.  This application contains 10,098 words, excluding all parts exempted from the word count. A motion to exceed the 5,200 word limit set forth in Fed.R.App.P. 27(d)(2)(A) is being filed together with this application.

2. This application complies with Fed.R.App.P. 27(d)(1)(E) and both the typeface requirements and type-style requirements of Fed.R.App.P. 32(a)(5) and Fed.R.App.P. 32(a)(6) because this application has been prepared in a proportionally faced typeface using Microsoft Word, the word processing software used to write this application in 14-point Times New Roman font.

Dated: August 2, 2022

> /s/ Todd G. Scher
> Todd G. Scher, Esq.
> Florida Bar No. 899641
> Law Office of Todd G. Scher, P.L.
> 1722 Sheridan Street #346
> Hollywood, Florida 33020
> Tel: 754-263-2349
> Fax: 754-263-4147
> tscher@msn.com
> Counsel for Movant-Appellant

## CERTIFICATE OF SERVICE

I, Todd G. Scher, HEREBY CERTIFY that a true and correct copy of this Application for Certificate of Appealability, as well as the notice of electronic filing, was served via CM/ECF on August 2, 2022 to:

David C. James, Assistant U.S. Attorney (edny.appeals@usdoj.gov)

/s/ Todd G. Scher
Todd G. Scher, Esq.
Florida Bar No. 899641
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, Florida 33020
Tel: 754-263-2349
Fax: 754-263-4147
tscher@msn.com
Counsel for Movant-Appellant